IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LORETTA UTHELL, individually, and, LORETTA UTHELL, as Administrator of the Estate of MELVIN H. UTHELL, Deceased, <br><br>      Plaintiffs, <br><br> vs. <br><br> MID-ILLINOIS CONCRETE, INC., An Illinois corporation and SOUTHERN ILLINOIS LABORERS' & EMPLOYERS' HEALTH AND WELFARE FUND, <br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) CIVIL NO. 05-4034-JLF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM AND ORDER

**FOREMAN, District Judge:**

Before the Court are the parties' cross-motions for summary judgment, (Docs. 36,39,40), and responses (Docs. 43,44,45, and 48). These motions are discussed below.

**I.   Background.**

The following facts are undisputed. Plaintiffs' decedent, Melvin H. Uthell, was a ready-mix concrete truck driver for his employer, defendant Mid-Illinois Concrete, Inc. (MIC). On July 25, 2003, MIC recognized the Laborers International Union of North America as the exclusive bargaining representative of a unit of employees (Doc. 37, ¶3).

On August 1, 2003, MIC and the Laborers Union entered into a collective bargaining agreement (Doc. 37, ¶3). Under this agreement, Mid-Illinois Concrete agreed to participate in the Southern Illinois Laborers' and Employers' Health and Welfare Fund (The Fund)

(Doc. 37, ¶3) as follows:

> The Company [MIC] agrees to participate in Plan A of the Southern Illinois Laborers Health and Welfare Fund for its full time employees who have completed their probationary period. The Company will pay for seventy-four percent (74%) of single coverage for all employees who are eligible for such coverage and will pay for sixty-eight percent (68%) of the cost for family coverage, with the employee contributing the differential, which amount shall be deducted from the employee's weekly paycheck. The Company's contributions for health insurance will cease immediately upon an employee's termination of employment or, in the case of layoff or a leave of absence for any reason, the month following a month in which the employee has not performed any work. In the event of any increase in the current stated premiums for Plan A, the parties agree to reopen this agreement solely for the purpose of negotiating insurance.

*(Doc. 36, Exh. 1, p.8, Art. XII).*

The Fund is a health and welfare fund that provides payments for medical claims and is required to be maintained and administered in accordance with the provisions of the Labor Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(1), (ERISA). Mr. Uthell was a member of the bargaining unit covered by the collective bargaining agreement.

MIC became a signatory to a Participation Agreement with The Fund effective September 1, 2003 (Doc. 37, ¶6). Also on September 1, 2003, Mid Illinois Concrete began making monthly contributions to The Fund, thereby making its employees eligible for coverage effective October 1, 2003 (Doc. 37, ¶9). Prior to October 1, 2003, MIC employees were covered by Blue Cross and Blue Shield health insurance. The terms of eligibility, coverage and benefits available to Mr. Uthell under Blue Cross and Blue Shield differed significantly from those under The Fund's plan (Doc. 37, ¶¶7,8).

On or before August 1, 2003, Melvin H. Uthell, developed terminal cancer. He worked for MIC through August 5, 2003, after which his poor health rendered him unable to work and he took a leave of absence (Doc. 37, ¶11). On November 21, 2003, Mr. Uthell returned to work for an 8 ½ hour shift to "help out during deer season." (Doc. 40, p.2).

Although Mr. Uthell stopped working on August 6, 2003, and returned one day in November, 2003, MIC continued to report to The Fund that Mr. Uthell was an active full time-employee until April 2004 (Doc. 37, ¶14). Also during this period, MIC continued to remit monthly active employee premiums to The Fund on Mr. Uthell's behalf (Doc. 37, ¶14).

MIC had a policy, (although it was not so obligated), that it would continue to pay its share of an employee's health care premium for sixteen (16) weeks after that employee ceased active employment (Doc. 39, p.8). On January 13, 2004, MIC sent Mr. Uthell a letter advising him that his sixteen-week period was about to expire and that he would be responsible for paying the entire premium himself (Doc. 39, p.8). This letter stated:

> Dear Melvin[,]
>
> You have already or will shortly exceed sixteen weeks of layoff or absence since October. According to the company benefits policy, the employee becomes responsible for all insurance costs for weeks in excess of sixteen during the fifty-two week period from October 1st through September 30th.
>
> Your weekly cost of insurance, when the company no longer contributes will be $171.70 per week. Please make arrangements for payment by sending a check weekly or having a greater amount withheld when you are on low earnings.
>
> Thank you for your attention to this matter.

>Sincerely,
>
>Marlys Thomas

*(Doc. 36, Exh. 5).*

Mr. Uthell advised MIC that he wanted to continue his coverage, and thereafter, he began sending the entire premium to MIC (Doc. 39, p.8). MIC then forwarded his premium to The Fund monthly (Doc. 39, p.8).

Shortly thereafter, Mr. Uthell asked MIC how much his premium would be if he changed from "family" to "single" coverage (Doc. 39, p.8). On January 29, 2004, MIC sent Mr. Uthell a letter advising him of the cost for single coverage (Doc. 39, p.8). This January 29, 2004 letter stated:

>Dear Melvin,
>
>You have already or will shortly exceed sixteen weeks of layoff or absence since October. According to the company benefits policy, the employee becomes responsible for all insurance costs for weeks in excess of sixteen during the fifty-two week period from October 1st through September 30th.
>
>Your weekly cost of insurance, when the company no longer contributes will be $85.16 per week. Please make arrangements for payment by sending a check weekly or having a greater amount withheld when you are on low earnings.
>
>Thank you for your attention to this matter.
>
>Sincerely,
>
>Marlys Thomas

*(Doc. 36, Exh. 6).*

In February, 2004, Mid-Illinois Concrete changed Mr. Uthell's coverage from family coverage to single coverage (Doc. 37, ¶15). Thereafter, Mr. Uthell sent in the monthly premium for single coverage, which MIC forwarded to The Fund (Doc. 39, pp.8-9).

Mr. Uthells' wife, Loretta Uthell, has testified that, "Mr. Uthell did not receive at any time . . . any notice from Mid-Illinois Concrete, Inc., or the Fund indicating that health coverage could be elected under (COBRA)" (Doc. 41, p.3, ¶11). MIC does not dispute the fact that it failed to provide Mr. Uthell with a COBRA continuation form.

In April, 2004, MIC informed The Fund that Mr. Uthell's last day of active employment at MIC was August 5, 2003 (Doc. 37, ¶11, Exh. 2). On June 16, 2004, MIC informed The Fund that Mr. Uthell had returned to work for an 8 ½ hour shift on November 21, 2003 (Doc. 40, p.2). Thus, on June 16, 2004, MIC informed The Fund that Mr. Uthell's last day of employment was revised to be November 21, 2003 (Doc. 37, ¶12).

Mr. Uthell died on June 22, 2004. Until his death, he underwent various medical procedures and certain cancer treatments. As noted above, eligibility and continuation of coverage under The Fund were limited to employees who maintained active work on a full-time basis (Doc. 37, ¶10).

On November 5, 2005, The Fund sent requests to admit to MIC asking for Mr. Uthell's attendance records. Upon review of these records, MIC did not designate any of Mr. Uthell's leave as leave under the FMLA (Doc. 36, Exh. 4).

Article 14, Section 3 of The Fund's plan of benefits states that:

> If false information on any material subject is furnished to the Trustees, they may deny all or part of the claim and may charge the claimant for expenses incurred relating to the falsehood. If benefits have already been paid based on false information on a material subject, the Trustees may recover the benefits plus expenses incurred in such recovery, including attorney's fees and investigation expense.

*(Doc. 36, Exh. 2, Part 5, p.6).*

It is undisputed that during 2003 and 2004, The Fund paid medical claims for Mr. Uthell in the amount of $94,762.89. It is also undisputed that The Fund denied payment of $50,092.00, which plaintiffs seek to recover from defendants.

Accordingly, plaintiffs Loretta Uthell, (individually, and as Administrator of the Estate of Melvin Uthell), have sued both MIC and The Fund in a four-count complaint under ERISA and the Illinois Family Expense Act. In Counts I and II, plaintiffs have sued The Fund alleging that Mr. Uthell was entitled to participate in The Fund's benefits and that The Fund failed to pay the benefits to which he was entitled. In Counts III and IV, plaintiffs have sued MIC alleging that MIC failed to issue the proper notice to Mr. Uthell of his insurance continuation under the Consolidated Omnibus Budge Reconciliations Act (COBRA). The Fund has brought a counterclaim against plaintiffs alleging that Mr. Uthell was not entitled to participate in plan benefits and that the amounts that it paid on his behalf must be returned to The Fund.

The Fund has moved for summary judgment against plaintiffs for $94,762.89 plus costs of suit, including attorneys' fees and other expenses. Plaintiffs and MIC have moved

for summary judgment in their favor. These cross-motions for summary judgment are discussed below.

## II.     Discussion.

Upon review of the record, there are two ways in which Mr. Uthell could have been an eligible participant in The Fund: 1) by maintaining active employee status as of October 1, 2003, the date The Fund benefits became effective; or 2) by electing COBRA coverage within the time-frame prescribed by law after the occurrence of a qualifying event.

The Fund has moved for summary judgment on the ground that Mr. Uthell was not eligible to participate in The Fund benefits and that Mr. Uthell did not elect COBRA coverage because MIC failed to give The Fund the statutorily required notice of Mr. Uthell's qualifying event. Upon review of the record, this Court agrees.

The Consolidated Omnibus Budge Reconciliation Act (COBRA) states that:

> **§ 1163        Qualifying event**
>
> For purposes of this part, the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under their part, would result in the loss of coverage of a qualified beneficiary:
>
> ***
>
> (2)    the termination . . . or reduction of hours, of the covered employee's employment.
>
> ***

*29 U.S.C. § 1163.*

With regard to notice requirements, COBRA states that:

> § 1166          Notice requirements
>
> **(a)    In general**
>
> In accordance with regulations prescribed by the Secretary--
>
> ***
>
> (2)    the employer of an employee under a plan must notify the administrator of a qualifying event described in paragraph . . . (2) . . . of section 1163 of this title within 30 days . . . of the date of the qualifying event.

*29 U.S.C. § 1166(a)(2).*

Here, on August 5, 2003, Mr. Uthell experienced a qualifying event because he ceased to be a full-time active employee and he experienced a reduction in hours.  In addition, the eligibility and coverage terms under MIC's predecessor carrier, Blue Cross and Blue Shield, were significantly different than that of The Fund.  The United States Court of Appeals for the Seventh Circuit has noted that when a participant suffers a "reduction in hours" which results in insurance coverage that is not identical to the predecessor coverage, the participant experiences a "qualifying event" and must be provided a choice under COBRA.  *See Lutheran Hosp. of Indiana, Inc. v. Business Men's Assur. Co. of America*, 51 F.3d 1308, 1315 (7th Cir.1995).  In addition, 29 C.F.R. § 825.500(c) states that "covered employers who have eligible employees must maintain records that must disclose the following:"

(2) Dates FMLA leave is taken by FMLA eligible employees (e.g. available from time records, requests for leave, etc., if so designated). Leave must be designated in records as FMLA leave; leave so designated may not include leave required under State law or an employer plan which is not also covered by FMLA.

*** 

(4) Copies of employee notices of leave furnished to the employer under FMLA, if in writing, and copies of all general and specific written notices be given to employees as required under FMLA and these regulations (see §825.301(b)). Copies may be maintained in employees personnel files.

*29 C.F.R. § 825.500(c).*

MIC argues, however, that Mr. Uthell had twelve (12) weeks of protected leave under the Family and Medical Leave Act, (FMLA), 29 U.S.C. 2601, et seq., According to MIC, the participation agreement with The Fund was signed on September 1, 2003, and Mr. Uthell's FMLA leave did not expire until sometime in November. Thus, argues MIC, Mr. Uthell was entitled to participate in The Fund benefits.

Under 29 C.F.R. § 825.208(2), however, it is employer's responsibility to designate an employee's leave as qualifying under the FMLA, and to give notice of the designation of the employee pursuant to the federal regulations. *29 C.F.R. § 825.208(2)*. Once an employer has acquired knowledge that an employee is taken leave under the FMLA, the employer must notify the employee that the leave is designated and will be counted as FMLA leave. *29 C.F.R. § 825.208(b)(1)*. If the notice by the employer is oral, then the notice must be confirmed in writing by the following payday. *29 C.F.R. § 825.208(b)(2)*.

Here, however, there is no question that MIC failed to designate the period from

August 6, 2003 through November 20, 2003 as FMLA leave. As noted, MIC produced Mr. Uthell's attendance records during discovery (Doc. 36, Exh. 4). Despite the fact that MIC's the attendance records contain a "Family-Medical Leave" absence code, MIC did not designate any of Mr. Uthell's leaves as FMLA leave. Another indication that MIC did not deem Mr. Uthell's leave as FMLA leave is that in April 2004, MIC informed The Fund that Mr. Uthell's last day of active employment was August 5, 2003. Both of these facts indicate that at no time did MIC consider Mr. Uthell's leave to be FMLA leave.

In addition, there are only two circumstances in which MIC could retroactively designate Mr. Uthell's leave from August 6, 2003 to November 20, 2003 as FMLA leave. *29 C.F.R. § 825.208(e)(1)&(2)*. These two circumstances are: 1) if the employee was absent for an FMLA reason and the employer did not learn the reason for the absence until the employee's return; or 2) if the employer knows the reason for the leave but has not been able to confirm that the leave qualifies under FMLA or is unable to timely receive a requested medical certification. *29 C.F.R. § 825.208(e)(1)&(2)*. Neither of these circumstances are present, here, thus, MIC may not retroactively designate Mr. Uthell's leave as FMLA leave.

Based upon the above, under 29 U.S.C. § 1166 (a)(2), MIC had an obligation to notify both The Fund and Blue Cross and Blue Shield, within thirty (30) days of the qualifying event, that on August 6, 2003, (or at the latest November 21, 2003), a COBRA qualifying event had occurred. MIC did not provide such notice, rather it waited until April 2004 to inform the Fund that Mr. Uthell's last day of employment was August 5, 2003.

MIC also argues that Mr. Uthell received notice of his insurance continuation coverage. Specifically, MIC argues that its January 13, and 28, 2004 letters to Mr. Uthell clearly put him on notice that he had the right to continue his health insurance by remitting the entire premium to MIC. MIC argues that this was a "good faith attempt to comply with a reasonable interpretation of the statute" which is sufficient to satisfy COBRA requirements, and cites *Jachim v. KUTV Inc.*, 783 F.Supp. 1328, 1333 (D. Utah 1992), and *Keegan v. Bloomingdales' Inc.*, 992 F.Supp. 974, 977 (N.D.Ill. 1998) in support.

With regard to *Jachim v. KUTV Inc.*, 783 F.Supp. 1328, 1333 (D. Utah 1992), the Court notes initially that it does not appear to represent the current law of the United States Court of Appeals for the Seventh Circuit. Specifically, *Jachim* found that an employee who went from forty (40) to zero (0) hours but did not suffer an immediate loss of health insurance coverage as a result of the reduction did not experience a qualifying event. *Jachim v. KUTV Inc.*, 783 F.Supp. 1328, 1333 (D. Utah 1992). The United States Court of Appeals for the Seventh Circuit, however, has noted that when a participant suffers a "reduction in hours" which results in insurance coverage that is not identical to the predecessor coverage, the participant experiences a "qualifying event" and must be provided a choice under COBRA. *See Lutheran Hosp. of Indiana,* 51 F.3d at 1315. In addition, *Jachim* is unhelpful for another reason. In *Jachim*, the issue was not whether the COBRA notice was provided at all, rather, the issue was whether the *manner* of communicating the notice was adequate. Specifically, *Jachim* held that the employer satisfied its obligation under § 1166(a)(2) by "timely sending adequate notice via first class mail to Jachim's last known address upon the

reasonable belief that Jachim still resided there." *Jachim*, 783 F.Supp. at 1334. Similarly, in *Keegan v. Bloomingdales' Inc.*, 992 F.Supp. 974, 977 (N.D.Ill. 1998), the issues were whether the employer had complied with § 1166(a)(2) after it gave COBRA notice on three separate occasions to the plan administrator and that the plan administrator had given proper notice to the employee by using "notification methods [] reasonably calculated to reach the former employee." *Keegan,* 992 F.Supp. 977-78. Here, in contrast, MIC has admitted that it did not provide *any* COBRA notice to either the Fund or Mr. Uthell whatsoever. Accordingly, MIC's reliance on both *Jachim* and *Keegan* is misplaced.

MIC also cites *Lincoln General Hospital v. Nebraska State Education Association Health Care Program*, 792 F.Supp. 67 (D.Neb. 1991), for the proposition that despite not providing any COBRA notice at all, it made a "good faith attempt" to comply with COBRA. In *Lincoln General Hospital,* however, the employer provided the employee with an actual COBRA "continuation of coverage form," which was labeled "Notice," and contained a description of an individual's rights under COBRA. *Lincoln General Hospital,* 792 F.Supp. at 70. In addition, the employee in *Lincoln General Hospital* actually filled out the COBRA continuation of coverage form and it was mailed to the plan administrator, thereby giving the administrator COBRA notice. *Lincoln General Hospital,* 792 F.Supp. at 69. Here, in contrast, Mr. Uthell was never given a continuation of coverage form, nor was such a form mailed to The Fund. Mr. Uthell was simply never given the opportunity to make a COBRA election.

Finally, MIC argues that Mr. Uthell made the required contributions and that he

therefore "understood" his rights and made an election for coverage. As noted, however, Mr. Uthell never made a COBRA election. Thus, the contributions he was paying were not COBRA contributions, rather, they were contributions applicable to active, full-time employees. This is supported by the fact that Mr. Uthells' wife, Loretta Uthell, has testified that, "Mr. Uthell did not receive at any time . . . any notice from Mid-Illinois Concrete, Inc., or the Fund indicating that health coverage could be elected under (COBRA)" (Doc. 41, p.3, ¶11). The record is clear that Mr. Uthell never received the required notice under COBRA because MIC neglected to comply with its statutory obligation to notify The Fund that Mr. Uthell had experienced a qualifying event.

Based on the above, MIC did not make a "good faith attempt to notify the plan administrator of the occurrence of a "qualifying event," as MIC made no attempt whatsoever to notify the Fund. MIC failed to give 29 U.S.C. §1166(a)(2)'s required notice that a qualifying event occurred in August 6, 2003, (or at the latest November 22, 2003), with regard to Mr. Uthell. As such, The Fund's obligation to notify Mr. Uthell of his rights never arose. MIC is solely liable for the benefits that Mr. Uthell would have received had he been notified of his right to continue his coverage. *Kidder v. H & B Marine, Inc.,* 932 F.2d 347 (5th Cir. 1991) (employer is solely liable for the difference between health benefits former employee received and benefits he would have received had he been notified of his right to continuation coverage).

### III.   Summary.

Based on the foregoing, the motion for summary judgment filed by the Southern

Illinois Laborers' & Employees Health and Welfare Fund, (Doc. 36), is **GRANTED.** The motion for summary judgment filed by Mid-Illinois Concrete, Inc., (Doc. 39), is **DENIED**. Plaintiffs' motion for summary judgment is **GRANTED IN PART and DENIED IN PART.** Plaintiffs' motion for summary judgment against Mid-Illinois Concrete, Inc., (Doc. 40), is granted, and plaintiffs' motion for summary judgment against Southern Illinois Laborers' & Employees Health and Welfare Fund is (Doc. 40) denied.

Judgment shall be entered in favor of plaintiffs and against Mid-Illinois Concrete, Inc., in the amount of $144,854.89. On the counterclaim of Southern Illinois Laborers' & Employees Health and Welfare Fund against plaintiffs, judgment shall be entered in favor of Southern Illinois Laborers' & Employees Health and Welfare Fund and against plaintiffs in the amount of $94,762.89. This action is **DISMISSED WITH PREJUDICE.** A separate Judgment shall accompany this Order.

  **IT IS SO ORDERED.**
  **DATED: December 11, 2006.**

          *s/ James L. Foreman*
           **DISTRICT JUDGE**